IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

SARAH JOHNSON,                         )
                                       )
                    Plaintiff,         )
                                       )
        v.                             )        Case No. 6:12-cv-3007-REL-SSA
                                       )
CAROLYN COLVIN, Acting Commissioner    )
of Social Security,                    )
                                       )
                    Defendant.         )

## <u>ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff Sarah Johnson seeks review of the final decision of the Commissioner of Social

Security denying plaintiff's application for disability benefits under Titles II and XVI of the

Social Security Act ("the Act").   Plaintiff argues that the Administrative Law Judge (ALJ) (1)

failed to adhere to the *de minimus* standard at step two as to her mental impairments; (2) failed to

give controlling weight to Medical Source Statements by one treating and one examining

physician; (3) and failed to conduct a proper credibility analysis.   I find that the substantial

evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.

Therefore, plaintiff's motion for summary judgment will be denied and the decision of the

Commissioner will be affirmed.

## I.    *BACKGROUND*

On November 19, 2008, plaintiff protectively applied for disability benefits alleging that

she had been disabled since October 1, 2005 (Tr. 124-72). [1]   Plaintiff's disability is due to a

combination of physical and mental impairments.   Plaintiff's application was denied on January

15, 2009 (Tr. 63-9).   On May 12, 2010, a hearing was held before an ALJ.   On July 30, 2010,

the ALJ found that plaintiff was not under a "disability" as defined in the Act (Tr. 11-29).   On

---

[1] Previously, on September 9, 2005, plaintiff applied for disability benefits alleging she had been disabled since August 15, 2005 (Tr. 119-23).   The applications were denied on November 3, 2005 (Tr. 58-9).

November 8, 2011, the Appeals Council denied plaintiff's request for review (Tr. 1-6).

Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.     STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final

decision" of the Commissioner.    The standard for judicial review by the federal district court is

whether the decision of the Commissioner was supported by substantial evidence.    42 U.S.C. §

405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847,

850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater,

100 F.3d 1389, 1392 (8th Cir. 1996).    The determination of whether the Commissioner's

decision is supported by substantial evidence requires review of the entire record, considering the

evidence in support of and in opposition to the Commissioner's decision.    Universal Camera

Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir.

1989).    "The Court must also take into consideration the weight of the evidence in the record

and apply a balancing test to evidence which is contradictory."    Wilcutts v. Apfel, 143 F.3d

1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S.

91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.    It means such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion."    Richardson v. Perales,

402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).    However, the

substantial evidence standard presupposes a zone of choice within which the decision makers can

go either way, without interference by the courts.    "[A]n administrative decision is not subject to

reversal merely because substantial evidence would have supported an opposite decision."    Id.;

Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

---

Plaintiff did not pursue her appeal rights any further.

### III.     BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.   42 U.S.C. § 423(d)(1)(A).   If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.   Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.   These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.   The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.     Is the claimant performing substantial gainful activity?

>     Yes = not disabled.
>     No = go to next step.

2.     Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

>     No = not disabled.
>     Yes = go to next step.

3.     Does the impairment meet or equal a listed impairment in Appendix 1?

>     Yes = disabled.
>     No = go to next step.

4.     Does the impairment prevent the claimant from doing past relevant work?

>     No = not disabled.
>     Yes = go to next step where burden shifts to Commissioner.

5.     Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.   THE RECORD

The record consists of the testimony of plaintiff and vocational expert George H. Horne, in addition to documentary evidence admitted at the May 12, 2010 hearing.

## A.   ADMINISTRATIVE REPORTS

The record contains the following administrative report:

## 1.   Earnings Report

The record shows plaintiff earned the following income from 1970 through 2008:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1970 | $    31.76 | 1990 | $19,480.77 |
| 1971 | 336.37 | 1991 | 21,292.46 |
| 1972 | .00 | 1992 | 21,500.18 |
| 1973 | .00 | 1993 | 1,819.26 |
| 1974 | .00 | 1994 | 14,042.74 |
| 1975 | .00 | 1995 | 16,893.52 |
| 1976 | .00 | 1996 | 8,387.32 |
| 1977 | 2,024.72 | 1997 | 1,023.73 |
| 1978 | 656.20 | 1998 | 7,488.52 |
| 1979 | 240.00 | 1999 | 5,583.26 |
| 1980 | 1,893.54 | 2000 | 9,390.01 |
| 1981 | 7,267.05 | 2001 | 10,454.61 |
| 1982 | 12,327.54 | 2002 | 13,146.25 |

| | | | |
|---|---|---|---|
| 1983 | 14,494.30 | 2003 | 13,826.20 |
| 1984 | 16,323.19 | 2004 | 14,560.12 |
| 1985 | 17,220.35 | 2005 | 13,134.24 |
| 1986 | 15,346.46 | 2006 | 432.39 |
| 1987 | 12,384.00 | 2007 | 3,310.26 |
| 1988 | 16,533.63 | 2008 | 3,901.34 |
| 1989 | 18,149.46 | | |

(Tr. 195).

### B.    SUMMARY OF MEDICAL RECORDS

As summarized by both plaintiff and defendant, the medical record reflects diagnosis and treatment of multiple medical problems including type II diabetes mellitus with peripheral neuropathy and peripheral vascular disease; degenerative disc disease, degenerative herniation, and spinal stenosis of the lumbosacral spine; and bilateral degenerative joint disease of the hips.[2]

### C.    SUMMARY OF TESTIMONY

During the May 12, 2010 hearing, plaintiff testified, and George H. Horne, a vocational expert (Tr. 111), testified at the request of the ALJ.

### 1.    Plaintiff's Testimony.

Plaintiff testified that she was born on January 30, 1953; is right handed; stands 6' tall; and weighs about 225 pounds.   She is single.   Plaintiff has a high school diploma (Tr. 36-7).

When asked what prevented her from working, plaintiff responded that her legs are "really bad" and "very weak" due to nerve damage.   She reported that her left leg swells when she stands very long or walks.   Plaintiff said that it becomes "kind of black."   Plaintiff related that her right leg drags when she is tired.   Due to lack of feeling in the balls and toes of her feet,

---

[2] As further discussed below, plaintiff also argues that her disability is due, in part, to depression and

plaintiff said she has problems walking, and falls. Although a cane had been prescribed due to the falls, plaintiff admitted that she is reluctant to use the cane because it makes her "look like an old lady" (Tr. 41, 47-8). Plaintiff reported that she experiences leg pain due to bad arteries. Plaintiff described burning, shooting pains and cramps in her legs that move into her back. She explained that lying down and putting her legs up helps reduce the pain (Tr. 43, 47-8).

Plaintiff also described back and hip pain for which she gets injections, which help reduce the pain; however, she noted that the pain can be aggravated if she does anything that turns her back, e.g., twisting her ankle (Tr. 41, 43).

Although the plaintiff described "a little trouble holding onto things," she admitted that this has only been happening lately and she has not been treated for the problem (Tr. 42-3).

Plaintiff acknowledged trouble controlling her diabetes. She attributed the difficulty to the stress that she experienced during the previous year, e.g., the death of her significant other, moving from where she had been living, finding another place to live, etc.

When questioned about her exertional abilities, plaintiff responded that she cannot carry more than five pounds. She reported that she could walk out of the building where the hearing was being conducted to the road, but she would have use a cane and stop. Plaintiff said that she can stand two to three minutes comfortably. She indicated that she can sit for 45 minutes to one hour if allowed to move around. Plaintiff testified that she can bend a little but said that she cannot squat at all. She reported recent difficulty holding onto items with her hands (Tr. 41-2).

When questioned about her daily activities, plaintiff responded that she and her son share meal preparation. She admitted doing general housework such as vacuuming and making the beds. In the mornings, plaintiff said she gets up, has a cup of coffee, wanders around, picks up stuff if she can, lets the dogs out, lies down, reads a little, and watches television. Plaintiff

anxiety.

reported that she spends much of the day sitting or lying down watching television or reading. She indicated she reads anything, e.g., science fiction, magazines, books. When she watches television, she likes "happy things" like the Hallmark channel. When her son comes home from school, plaintiff said that she watches him, plays video games with him, and may watch a movie together. Plaintiff does grocery and other shopping, doing as much as possible at one time. Plaintiff reported that her son helps with laundry -- she does not like doing it because it is so heavy. Plaintiff said that she stopped walking down to the creek for fear that she would fall, and that she no longer rides horses, hikes, or swims (Tr. 44-6). Plaintiff acknowledged that she drove from her home in Mountain Grove, Missouri, to the hearing site in Springfield, Missouri, but that she usually does not drive more than one hour at a time (Tr. 36-7).

2.     **Vocational Expert Testimony.**

Vocational expert George H. Horne testified at the request of the ALJ. The expert classified plaintiffs past relevant work as a general merchandise sales person as semi-skilled, light as performed in the national economy, but medium to very heavy as performed by plaintiff; sales clerk as semi-skilled, light as performed in the national economy, and light as performed by plaintiff; and cashier/checker as semi-skilled, light as performed in the national economy, but up to very heavy as performed by plaintiff (Tr. 50).

The expert did not consider plaintiff's part-time work as a school bus driver after the alleged disability onset date as substantial gainful activity; therefore, it was not "relevant" past work. The ALJ agreed (Tr. 51).

When asked to assume plaintiff had the residual functional capacity (RFC) to lift up to 20 pounds occasionally and 10 pounds frequently; stand and/or walk about six hours in an eight hour day; sit up to six hours in an eight hour day; frequently balance and climb ramps and stairs;

occasionally stoop, kneel, crouch, crawl, and climb ladders, ropes, and scaffolds; and never experience concentrated exposure to extreme cold, vibration, fumes, odors, and dust, the expert opined that plaintiff would be unable to perform her past relevant work as a general merchandise sales person at the feed store due to the exposure to irritants. He also related that the job of cashier/checker at a convenience store, as she performed it, would be precluded by the weight limits. However, the expert testified that plaintiff could return to her past relevant job of sales clerk in a video store, both as performed nationally and as plaintiff performed the job, and to the job of cashier/checker, as it is performed nationally (Tr. 51).

In response to a second hypothetical that asked to assume a RFC to lift up to 50 pounds occasionally and 25 pounds frequently; stand and/or walk up to 15 minutes at a time for a total of four hours during an eight hour day; sit up to two hours at a time for a total of eight hours during an eight hour day; frequently reach, handle, finger, feel, see, speak, and hear; occasionally climb, stoop, kneel, crouch, and crawl; never balance; and never experience concentrated exposure to extreme cold and heat, weather, wetness, humidity, dust, fumes, vibration, hazards, and heights, the expert said that all past relevant work would be precluded because it required plaintiff to be on her feet the majority of the day. The expert testified that the environment factors would also preclude a return to past relevant work (Tr. 52).

The expert went on to testify that the past relevant jobs would also be precluded if the second hypothetic were to include an inability to maintain persistence and pace on simple tasks or to complete a normal workday/workweek without interruptions (Tr. 52).

## V.   *FINDINGS OF THE ALJ*

Administrative Law Judge Kenton W. Fulton entered his opinion on July 30, 2010.   The ALJ found plaintiff had worked since October 1, 2005, the alleged disability onset date, but the

work did not rise to the level of substantial gainful activity.[3]   The ALJ found her back, left hip, and type II diabetes with complications of peripheral vascular disease and peripheral neuropathy were severe impairments.   The ALJ found plaintiff had no severe mental impairment.   He found no impairment met or equaled the severity requirements of a listed impairment in Appendix 1.   The ALJ found plaintiff retained the RFC to perform less than a full range of light work.   The ALJ found that she was able to return to her past relevant work of sales clerk and cashier/checker, as the occupations are defined by the Dictionary of Occupational Titles (DOT). The ALJ concluded that plaintiff was not disabled.

## VI.    ANALYSIS.

### A.    STEP TWO OF THE SEQUENTIAL EVALUATION

Plaintiff first argues that the ALJ failed to apply the *de minimus* standard at step 2 of the sequential evaluation when he found that plaintiff did not have a severe mental impairment. Plaintiff argues the ALJ findings that plaintiff had no limitations in activities of daily living, no limitations in ability to function in social settings, and no limitations in concentration, persistence, or pace are not supported by substantial evidence on the record as a whole.

Plaintiff cites a report from an examining psychologist who diagnosed her with a major depressive disorder.   Plaintiff also cites an assessment by a treating physician that she has more than mild limitations.

Plaintiff argues notations in treatment records and the medications prescribed also preclude a finding of no severe mental impairment.

In response, defendant argues the ALJ correctly considered plaintiff' depression in his

---

[3]  At the May 12, 2010 hearing, the ALJ also questioned plaintiff as to postings to her earnings account for the 4th quarter of 2007, all four quarters of 2008, and all four quarters of 2009 by "The Davy Tree Expert Company" in the name of "Hilarto Ocampo" (Tr. 176-81 and 187).   Plaintiff denied knowing this employer and denied knowing this person.   Based on the fact that the entry was for Hilarto Ocampo, not plaintiff, the ALJ concluded that the records are not plaintiff's (Tr. 40).

decision but properly declined to find the depression "severe." Defendant notes that the severity finding is consistent with the ALJ's rating of plaintiff's functional limitations under the "paragraph B" criteria.

Defendant notes the diagnosis of depression does not necessitate a finding of "severe" and plaintiff often denied depression and reported having good or normal mood. Defendant argues the ALJ explained why he assigned little weight to the opinions of a family physician that treated plaintiff for physical problems and the psychologist who only saw plaintiff once. Defendant notes the judge cited plaintiff's own statements that contradict the psychologist's rating of marked impairment in the areas of social functioning and concentration, persistence, or pace.

Defendant argues the ALJ's finding that the psychological consultant's conclusions are more consistent with the evidence was appropriate because the consultant considered plaintiff's longitudinal treatment; and points out that plaintiff's depression was controlled with management and her cognition was intact. Defendant also observes that the consultant considered the lack of mental health limitations when plaintiff discussed her daily activities.

At step 2 of the sequential evaluation, plaintiff must have a severe impairment or combination of impairments that lasted or is expected to last for at least twelve months. See 20 C.F.R. §§ 404.1520(a)(4)(ii) and 404.1509 and 416.920(a)(4)(ii) (describing step two) and 416.909 (describing durational requirements). A "medically determinable impairment" is an impairment that "results from anatomical, physiological, or psychological abnormalities and must be shown by "medical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques." See 20 C.F.R. §§ 404.1529(b) and 416.929(b). Additionally, a medically determinable impairment is "severe" if it more than minimally affects

the claimant's ability to perform work-related activities. <u>See</u> <u>Nguyen v. Chater</u>, 75 F.3d 429, 431 (8th Cir. 1996); 20 C.F.R. §§ 404.1521 and 416.921; Social Security Ruling (SSR) 1996-3p. The burden of establishing a severe impairment is on the claimant. <u>Nguyen</u>, 75 F.3d at 430-31. Although severity is not an "onerous" requirement, it is also not a "toothless standard," and the Eighth Circuit has upheld the Commissioner's finding that a claimant failed to meet this standard on numerous occasions. <u>See</u> <u>Kirby v. Astrue</u>, 500 F.3d 705, 708 (8th Cir. 2007) (citing <u>Hudson v. Bowen</u>, 870 F.2d 1392, 1395 (8th Cir.1989)).

On January 15, 2010, Michael Ball, M.D., completed a *Medical Source Statement-Mental* form at the request of counsel. He found plaintiff was "not significantly limited" in 16 basic work areas; "moderately limited" in four basic work areas; "markedly limited" in zero basic work areas; and "extremely limited" in zero basic work areas (Tr. 608-09).

On March 23, 2010, Janice L. May, Psy.D., performed a consultative psychological examination at the request of the Wright County (Missouri) Family Support Division. She diagnosed a major depressive disorder, single episode, severe. The examiner rated plaintiff's Global Assessment of Function (GAF) at 50. She concluded plaintiff's mental health symptoms appeared to have a significant impact upon ability to obtain or maintain gainful employment or engage in gainful activities for which her intellectual level, age, training, experience, or education might allow (Tr. 803-07). Two days after the consultative examination, at the request of counsel, Dr. May also completed a *Medical Source Statement-Mental* form. Dr. May found plaintiff was "not significantly limited" in 11 work-related areas; "moderately limited" in four work-related areas; "markedly limited" in five work-related areas; and "extremely limited" in zero work-related areas (Tr. 809-10).

As to the four broad functional areas known as the "paragraph B" criteria, the ALJ found

no limitation in the first three areas and no episodes of decompensating in the last.

As to daily activities, the first of the paragraph B criteria, the ALJ noted plaintiff lives with her son, manages her own affairs, cares for her own personal needs, and drives a vehicle.

As to social functioning, the second of the paragraph B criteria, the ALJ related there was no evidence of record of a legal history or a history of job loss brought on by inability to function socially. The ALJ observed that plaintiff self-reported no problems getting along with others and that she got along with authority figures "very well."

As to concentration, persistence, or pace, the third paragraph B criteria, the ALJ noted plaintiff is a high school graduate and self-reported that she is able to manage her finances, drive a car, shop, and prepare meals. She also reported that she is "mentally alert," and is able to follow written instructions and follow spoken instructions "very well."

As further discussed below, the ALJ mentioned plaintiff's mental problems when evaluating the weight to be given an opinion by an examining psychologist and an opinion by a non-treating/non-examining psychological consultant.

Plaintiff argues that the fact that plaintiff "was consistently prescribed Zoloft, Xanax, and Cymbalta for treatment of her symptoms" validates her argument that the mental problems are severe. However, on a *Claimant's Medications* form submitted by plaintiff on March 17, 2010, while Cymbalta is listed as being taken for depression, no medication is listed as being taken for anxiety (Tr. 313). When plaintiff's family physician prescribed Cymbalta on April 3, 2007, the office visit was due to "leg pain." There is no mention of depression in the office notes from that visit (Tr. 455). During a March 2010 consultative psychological examination, the Cymbalta is listed as being prescribed for both "depressive symptoms and pain" (Tr. 805). At the May 12, 2010 hearing, plaintiff testified that the Cymbalta is more for pain relief than for her depression

(Tr. 43).

On January 8, 2004, plaintiff wanted "happy pills." Zoloft was prescribed (Tr. 400).

The alleged disability onset date is over 20 months later on October 1, 2005.

In October 2004, Dr. Ball's office notes list Zoloft as one of plaintiff's medications on two occasions (Tr. 393-94). This is almost exactly one year prior to the alleged disability onset date. Another Zoloft prescription was originally filled on June 10, 2005. It was refilled on July 15, 2005 (Tr. 359). The alleged disability onset date is two months later. The record does not contain a prescription for Zoloft after July 2005.

The only prescription of medication solely for an emotional problem after October 1, 2005, was issued on January 1, 2007 when plaintiff was prescribed Xanax for "anxiety" (Tr. 402). There is no evidence in the record that this Xanax prescription was renewed or refilled.

In summary, I do not find the infrequent use of prescription medication supports plaintiff's allegations.

Just as the medication treatment record fails to support plaintiff's allegations of a severe mental impairment, so does her argument that notations in the medical record support the allegations. On January 8, 2004, a desire for "happy pills" was listed as to complaints, depression was listed as to mental illness, and Zoloft was prescribed (Tr. 400); on February 23, 2004, there were no mental complaints, no mental illness diagnosis was listed, but Zoloft was listed as a medication (Tr. 398); on August 17, 2004, plaintiff complained of "trouble sleeping," depression was diagnosed, and Zoloft was prescribed; and on October 4, 2004, there were no mental complaints, no mental impairment diagnosis, but Zoloft was listed as a medication (Tr. 394). All of these notations occurred in 2004, one to one-and-a-half years before to the alleged disability onset date of October 1, 2005.

On April 3, 2007, plaintiff had no mental health complaints and no symptoms of an emotional impairment; however, depression was diagnosed and Cymbalta prescribed, presumably to treat the leg pain (Tr. 455). On May 27, 2008, plaintiff complained of significant lower extremity pain that prevented her from sleeping. Plaintiff described her mood as "fairly good." While she demonstrated "significant pressure of speech" and anxiety and depression were diagnosed, the physician described plaintiff as in "good spirits"; and Ambien was prescribed as a sleep aid (Tr. 440). On April 1, 2009, while there were complaints and or symptoms of anxiety and depression, no medication was prescribed for an emotional condition (Tr. 684-85). On May 4, 2009, plaintiff's family physician observed that she was not caring for herself; however, plaintiff "blame[d] this on her boyfriend's depression." Plaintiff was reportedly "very loud and aggressive" during the examination. No mental illness was diagnosed and no medication was prescribed for a psychiatric problem (Tr. 667-68).

In summary, I do not find these limited notations of mental health problems consistent with a "severe" mental impairment.

In his decision, the ALJ cited plaintiff's education and work activity. At the 2010 hearing, plaintiff testified that she stopped working in October 2005, after being kicked by a bull (Tr. 40). Plaintiff noted that she had to leave Casey's due to pain (Tr. 48-9). Plaintiff reported that she earned a commercial driving license (CDL) so she could be a substitute bus driver (Tr. 39), and worked as a substitute school bus driver for two years after the October 2005 alleged disability onset date (Tr. 239). Plaintiff testified that she stopped driving the school bus because the bus company's policy (1) prohibited taking medication and (2) required a driver to climb the steps of the bus, which presented difficulties to plaintiff (Tr. 40). I note plaintiff did not describe any problems with cognition while working at Casey's, obtaining her CDL, or driving a

bus; and plaintiff did not describe any mental health problems while dealing with co-workers at Casey's or the students on the bus.   Similarly, she did not describe any problems resulting from depression, anxiety, or another mental illness while working at Casey's, earning her CDL, or driving a bus.

As noted by the ALJ, Dr. May is a consulting psychologist.   Currently, plaintiff is not followed by a psychiatrist, psychologist, or any other mental health provider.   Plaintiff has never received any outpatient treatment from a mental health provider for depression, anxiety, or any other mental impairment; has never been treated at an emergency room for an emotional problem; and has never been hospitalized for depression, anxiety, or any other psychiatric condition.

In passing, I note that the *Medical Source Statement-Mental* form is a "checklist," and that neither Dr. Ball nor Dr. May provided any explanation of their ratings on the form.   Further, while Dr. May's completed the form two days after her consultative examination, most of Dr. Ball's treatment records are from 2004 (Tr. 392-400 and 529-37), before the alleged disability onset date.

I find the ALJ's conclusion that plaintiff has no "severe" mental impairment is supported by substantial evidence of the record as a whole.

## B.      WEIGHING *MEDICAL SOURCE STATEMENTS*

Plaintiff next argues that the ALJ failed to give controlling weight to a *Medical Source Statement-Mental* form by a psychologist and a *Medical Source Statement-Physical* form by her current family physician.[4]

As to the family physician's opinion, plaintiff argues that it was supported by her own

---

[4] In plaintiff's opening statement about "controlling weight," she did not differentiate between the family physician, a "treating" doctor, and the psychologist, a "one-time-only" examiner.   The psychologist's opinion is not entitled to "controlling weight."

clinical notes, the objective diagnostic testing, the opinion and impressions of the specialist, and the subjective reports made by plaintiff; and therefore, if not controlling weight, the opinion of the family physician is entitled to substantial weight.

As to the psychologist, plaintiff complains that the ALJ accepted the opinion of a non-treating/non-examining psychological consultant but giving "little" weight to the opinion of Dr. May, the examining psychologist. Plaintiff notes that the non-treating/non-examining psychological consultant did not have a treating or examining relationship with plaintiff, and that his opinion was issued on January 15, 2009, when the medical record was incomplete. Plaintiff also points out that the examining psychologist's report is more recent than the non-treating/non-examining psychologist.

In response, defendant acknowledges that the family physician's checklist form *Medical Source Statement-Physical* was entitled to some, but "little" weight. Defendant notes the ALJ was critical of the family physician's checklist because it failed to provide supporting documentation and included statements inconsistencies with the physician's own treatment notes. Defendant asserts that the ALJ assigned little weight to the opinion of the psychologist because it was conclusory, not based on longitudinal treatment history, not supported by psychological testing, and inconsistent with the medical record as a whole.

Defendant responds that it was appropriate for the ALJ to consider the opinion of the psychological consultant because the consultant observed that (1) plaintiff's depression was controlled with medication; (2) plaintiff regularly reported being in good spirits and free of cognition problems; and (3) plaintiff did not include any mental health restrictions in her daily activities when applying for benefits.

Medical source statements are medical opinions submitted by acceptable medical sources, including treating sources and consultative examiners, about what an individual can still do despite a severe impairment(s), in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis. SSR 1996-5; see 20 C.F.R. §404.1513(a) (defining "acceptable medical source").   Generally, the opinions of an examining psychologist or physician should be given greater weight than the opinions of a source of one who did not examine a plaintiff. Shontos v. Barnhart, 328 F.3d 418, 425 (8th Cir. 2003).

The opinion of a treating physician is "generally given controlling weight, but is not inherently entitled to it." Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007)(quoting Hacker v. Barnhart, 439 F.3d 934, 937 (8th Cir. 2006).   An ALJ may elect not to give controlling weight to a treating physician when their opinions are "not supported by diagnoses based on objective evidence" or if the opinions are "inconsistent with or contrary to the medical evidence as a whole."   Id.   A treating physician's opinions may be entitled to less weight if the opinions are not supported by his or her own treatment notes.   See Owen v. Astrue, 551 F.3d 792, 789-99 (8th Cir. 2008).

On January 15, 2009, Kenneth Burstin, Ph.D., a non-treating/non-examining psychological consultant for the Missouri Disability Determinations Services (DDS), reviewed the records relating to plaintiff's mental health since October 1, 2005 and completed a Psychiatric Review Techniques Form (PRTF) that concluded plaintiff's mental impairments were not severe (Tr. 501-11).[5]

On March 23, 2010, plaintiff underwent Dr. May's consultative psychological examination at the request of the Family Support Division.   She diagnosed a major depressive

---

[5] On November 3, 2005, Dr. Burstin, in reference to plaintiff's 2005 claim, also found that her mental impairments were not severe (Tr. 501-11).

disorder, single episode, severe.   The examiner rated plaintiff's GAF at 50.   She concluded

plaintiff's mental health symptoms appeared to have a significant impact upon ability to obtain

or maintain gainful employment or engage in gainful activities for which her intellectual level,

age, training, experience, or education might allow (Tr. 803-07).   Dr. May found plaintiff was

"not significantly limited" in 11 work-related areas; "moderately limited" in four work-related

areas; "markedly limited" in five work-related areas; and "extremely limited" in zero

work-related areas (Tr. 809-10).

On March 29, 2010, Nancy Hayes, M.D., plaintiff's family physician, completed a

*Medical Source Statement-Physical* form at the request of counsel.   Dr. Hayes opined plaintiff

can lift and/or carry 25 pounds frequently and 50 pounds occasionally; stand and/or walk less

than 15 minutes at a time and four hours total during an eight-hour workday; sit two hours at a

time and eight hours total during an eight-hour workday; never balance; occasionally climb,

stoop, kneel, crouch, and crawl; and frequently reach, handle, finger, feel, see, speak, and hear.

While the physician suggested limited ability to operate foot controls, she found no limits on the

operation of hand controls.   Dr. Hayes opined that plaintiff should avoid concentrated exposure

to extreme cold, extreme heat, weather, wetness/humidity, dust/fumes, vibration, hazards, and

heights.   She also suggested plaintiff needs to lie down or recline during the day to alleviate

symptoms.   Dr. Hayes did not provide any significant explanation for her opinion and did not

accompany the form with any objective medical records (Tr. 812-13).[6]

In his July 30, 2010 decision, as to Dr. May's opinion about ability to gain or engaged in

gainful employment, the ALJ noted that a statement by a medical source that a claimant is

"disabled" or "unable to work" does not mean that she will be found disabled as that term is

defined in the Act.   The final responsibility for deciding the ultimate issue of disability is

reserved to the Commissioner. 20 C.F.R. §§ 404.1527(c) and 416.923(c) and SSR 1996-2p

In addition, as to Dr. May's ratings on the *Medical Source Statement-Mental* form, the ALJ noted the psychologist's lack of treating relationship. The ALJ found that the psychologist's opinion was not supported by psychological testing or the medical evidence as a whole; and therefore, he gave Dr. May's opinion "little" weight.

The ALJ noted the record contains Dr. Burstin's 2009 PRTF opinion. The ALJ "accepted" the Burstin opinion as further support for the finding of non-severe mental impairments. Earlier in his decision, when discussing the opinions of Missouri DDS medical consultants as to plaintiff's physical impairments, the ALJ recognized that these opinions are from non-examining sources and, therefore, the opinions do not as a general matter deserve as much weight as those of examining or treating physicians. However, the ALJ went on to state that the opinions deserve some weight, particularly in a case where there exists other evidence supporting the opoinions.

The ALJ extensively discussed the medical record and concluded that it showed improvement in plaintiff by mid-2008, with little, if any, evidence of additional complaints or treatment afterwards. I find that this discussion must be considered when reviewing the ALJ's evaluation of the weight he gave to Dr. Hayes' opinion. The judge's discussion of the medical record, as well as his specific discussion of Dr. Hayes' opinion, supports his finding of some, but not controlling weight. Likewise, the ALJ's discussion of plaintiff's daily activities and her non-compliance with treatment, especially as to her diabetes, adds weight to his discounting of Dr. Hayes' opinions. I also note that the ALJ did not completely discount the opinion but, instead, incorporated many of the limitations propounded by Dr. Hayes in arriving at his RFC, e.g., limited balancing, climbing, stooping, kneeling, crouching, crawling, climbing, and

---

[6] The most recent medical evidence of record from Dr. Hayes is dated December 3, 2009 (Tr. 625-27).

exposure to contaminants.

As mentioned earlier, the ALJ discussed plaintiff's non-compliance with treatment recommendations, including treatment recommendations by Dr. Hayes, and the doctor's observation that plaintiff "seems to want the medical profession to fix her without any effort on her part." This is statement is significant because Dr. Hayes does not mention plaintiff's non-compliance in her opinion.

I find that the ALJ did not err by discounting Dr. Hayes' opinions.

The ALJ also discussed Dr. May's report and rating, and provided proper reasons to discount the report. Part of the opinion contained in the report, as noted by the ALJ, is reserved to the Commissioner, and another part of the opinion exceeds the expertise of a psychologist and opines about matters usually reserved for a vocational expert. In reviewing the ALJ's findings of no severe mental impairments and the functional limitations at step three, the judge thoroughly discussed the reasons for discounting Dr. May's opinion. The ALJ observed, for example, that Dr. May's examination was a one-time-only consultative examination and that plaintiff never received any treatment by a mental health professional. As pointed out earlier, neither the infrequent prescription of medicine for a mental impairment nor the sporadic mention of depressive symptoms provides support for Dr. May's ratings.

Concerning the adequacy of the medical record supporting the reports by Dr. Burstin and Dr. May, the plaintiff's alleged disability onset date of October 1, 2005. In March 2009, Dr. Burstin had available medical from February 2002 to April 2007 (Tr. 348-86); May 2008 (Tr. 387-90); April to October 2008 (Tr. 406-22); and August 2006 to December 2008 (Tr. 423-87). On the other hand, Dr. May's report appears to be based solely on plaintiff's self-reporting, because there is no indication that the doctor reviewed any treatment records (Tr. 803-07).

Furthermore, during Dr. May's March 2010 examination, plaintiff described "overwhelming difficulties" resulting from her partner's death in November 2009, and an ensuing conflict with his mother (Tr. 804).  Plaintiff reported experiencing moderate to severe symptoms for more than six months - about the same timeframe in which she was dealing with her partner's death and difficulties with her partner's mother.

Based on the above, I find that the record supports the ALJ's finding that Dr. May's opinions are entitled to little weight.

## C.     PLAINTIFF'S CREDIBILITY

Finally, plaintiff argues the ALJ erred finding not credible plaintiff's allegations about her physical limitations.

Plaintiff takes issue with the ALJ's findings as to medication compliance and work record, alleging that her noncompliance with treatment/medications was due to her mental impairments and her inability to pay for treatment, and that her inability to work was caused by her employer's policies concerning the requirements for a bus driver (e.g., climbing steps and no medications).

Plaintiff also complains that the ALJ misstated her daily activities, citing testimony that much of her day is spent sitting, lying down, watching television, or reading.  Plaintiff asserts that her attempts to perform basic activities of daily living are not indicative of an ability to work an eight-hour day.

In response, defendant observes that the ALJ made "notable" observations regarding plaintiff's credibility, which must be considered in evaluating the determination as a whole. Specifically, defendant notes that the ALJ considered plaintiff's treatment notes reflecting significant improvement after her back surgery and hip joint injections; observed that plaintiff's

self-reported daily activities are inconsistent with her allegations of pain; cited reports that plaintiff disregarded her doctors' advice about her diabetes suggesting that plaintiff's limitations from the diabetes are not as debilitating as alleged; and found nothing in the record indicating plaintiff's depression had any impact whatsoever on her ability to comply with the diet, exercise, monitoring, medication, and use of special stockings associated with her diabetes.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states

that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

Plaintiff has a history of medical problems:

- In 2003, 2006, and 2008 lumbar imaging showed disc herniation, disc degeneration, and/or spinal stenosis of the lumbar spine (Tr. 771-72. 780, 787, 801). On January 2, 2008, plaintiff underwent nerve root decompression without complications (Tr. 795-96). On post-operative follow up, plaintiff's leg and back pain was essentially gone, much improved, or greatly improved (Tr. 420, 780, 782, 784-85, 788, 790). March 24, 2008, lower extremity electromyogram (EMG) and nerve conduction velocity study (NCVS) were consistent with axonal polyneuropathy or multiple radiculopathies (Tr. 470-71).

- Although plaintiff was diagnosed with type II diabetes mellitus in 2004 (Tr. 396), this was treated with only oral medication until September 22, 2009 (Tr. 637). Now plaintiff gets insulin injections (Tr. 313). Although plaintiff's blood sugar readings continue to be elevated, she has not undergone inpatient hospitalization caused by elevated blood sugar. Glucose monitoring, diet, weight loss, exercise, and compression stockings, have been repeatedly prescribed/recommended but plaintiff's compliance has been spotty (Tr. 341, 342, 361, 446, 449, 450, 452, 454, 457-58, 636, 646-52, 664, 667-68, 675, and 685).

- Plaintiff has not been treated for eye, heart, kidney, or brain damage due to the diabetes.

- A June 14, 2005 treadmill stress test with echocardiogram showed no significant cardiac abnormalities (Tr. 320-21).

- Since 2004, the record shows bilateral lower extremity varicose veins, decreased peripheral pulses, foot drop, and/or sensation deficits in a "stocking" distribution to light touch, but not pinprick.   Both peripheral vascular disease and peripheral neuropathy have been diagnosed due to the diabetes (Tr. 341-46, 388, 440, 449-52, 470-71, 611-14, 620, 636-37, 646-52, 664-85, 696-98, and 780).   There are no unhealed ulcers or gangrene resulting from uncontrolled diabetes.

- On April 12, 2006, plaintiff underwent left greater saphenous vein ablation without significant complications (Tr. 697) and on May 9, 2006, she underwent right greater saphenous vein ablation without complications (Tr. 696).   On November 29, 2006, plaintiff reported that she was recovering well from the procedures (Tr. 706).

- In 2006, 2007, and 2008, imaging showed moderate degenerative joint disease/osteoarthritis of the hips (Tr. 479, 484, 784-85).

- Since 2008, plaintiff has not undergone any surgery for physical impairments. Plaintiff has received no inpatient, emergency room, or outpatient treatment for any injuries from a fall caused by muscle weakness, numbness, poor balance, foot drop, etc.

- Plaintiff sporadically tests her blood sugars and takes medication for her orthopedic/neurologic/vascular pain (Tr. 313).   While she testified at the 2010 hearing that her medication sometimes made her lethargic, she admitted that she "usually [did] pretty good" (Tr. 39).   Until September 22, 2009, plaintiff only

sporadically took oral medication for her diabetes (Tr. 637). Currently, plaintiff sporadically wears compression hose and uses a cane (Tr. 603, 636, 649, and 652).

- Plaintiff does not wear a back brace, foot/ankle orthotic, knee brace, or TENS unit.

- Plaintiff has received physical therapy and attended a pain clinic where she received hip and low back injections that reportedly provided at least pain relief until recently (Tr. 408, 411, 413, 415, 416, 418, 477, 684, 776-77, 798, 800-01).

- Plaintiff has not received acupuncture, chiropractic adjustment, or osteopathic manipulation.

While the ALJ did not discuss plaintiff's prior work record, he noted that plaintiff worked part time as a school bus driver since October 2005. Although plaintiff characterizes the employment as "brief" in her argument, the ALJ noted posting's to plaintiff's earnings record by the "County of Mountain Grove" for three years (2006, 2007, and 2008). According to plaintiff's 2010 testimony, the school-bus job ended because she was unable to climb into the bus and drive while taking her medication; not because she was unable to stand, walk, sit, lift, or carry; or needed to lie down/recline; or could not concentrate because of severe and intractable pain or a mental condition. Furthermore, plaintiff's employment as a school bus driver was after her alleged disability onset date.

The ALJ also pointed out that plaintiff self-reported in December 2008, more than three years after the alleged disability onset date, that she did household chores and laundry, prepared meals, read, cared for her pets, handled money, spent time with others, drove a vehicle, and shopped (Tr. 228-38).

The ALJ observed plaintiff had undergone bilateral L4-L5 decompressions in January 2008, with post-surgical statements by plaintiff that her back pain was "much improved." The ALJ noted that plaintiff underwent right L5-S1 injections, with follow-up reports by plaintiff in October 2008, that she was more active and having only mild left lower back pain, and no radicular leg symptoms. During the same timeframe, plaintiff's treating sources found she was "doing well enough that further intervention is not indicated." The ALJ noted that plaintiff was not scheduled for follow-up and advised to contact the provider if her pain worsened, and that there was little or no evidence of exacerbation of her low back pain or further treatment by the provider.

Likewise, the ALJ cited the successful treatment of plaintiff's left hip degenerative joint disease/osteoarthritis. Specifically, the ALJ cited August 2008 treatment notes reporting that "[plaintiff's] hip joint pain, in fact all of her pain of the left side is resolved." The ALJ also observed that there was little or no evidence of acute exacerbations of plaintiff's hip pain or frequent treatment of the hip after August 2008.

Although the ALJ acknowledged plaintiff had uncontrolled type II diabetes with complications of peripheral vascular disease and peripheral neuropathy, he attributed much of these problems to plaintiff's non-compliance with diet, exercise, medications, and her "not wearing diabetic socks or good fitting shoes." The ALJ concluded that plaintiff's lack of compliance with medical directives suggested that her diabetic symptoms were not as limiting as alleged.

Finally as to treatment regimen, the ALJ noted plaintiff had an abnormal NCVS/EMG in March 2008 and her neurologist, Jenifer Zhai, M.D., assessed gait difficulty and behavior problems. The physician advised plaintiff that behavior modification would help her gait and, if

26

the right foot drop got worse, the doctor would consider giving her an ankle-foot orthotic;

however, there was little or no follow-up with Dr. Zhai after March 2008.

Although Dr. Hayes mentioned plaintiff's need for a cane, the ALJ observed that other

records reported that plaintiff "doesn't bother with a cane."

Plaintiff argues that the medical evidence supports Dr. Hayes' opinion concerning

disabling pain, but the ALJ extensively discussed the medical evidence and found it inconsistent

with her complaints.

In the discussion of the medical record, defendant points out notations in the treatment

records of daily activities that contradict plaintiff's testimony.   Specifically, on April 3, 2007,

plaintiff told Dr. Hayes that she had been "kicked in the leg by a horse one week prior" (Tr.

455); on August 24, 2007, she told Dr. Hayes that she wished to defer any changes in her

regimen until after she returned from a cruise to the Bahamas (Tr. 450); on November 6, 2007,

she told Dr. Hayes that she had recently returned from the cruise (Tr. 499); on May 27, 2008, Dr.

Hayes stated that plaintiff had been "traveling recently" (Tr. 440); on April 17, 2009, Dr. Hayes

noted plaintiff had recently "returned from a cruise" (Tr. 684); and on September 22, 2009,

plaintiff had just returned from a visit to her mother (Tr. 636).

Plaintiff argues that performing a few basic work activities is "in no way indicative of an

ability to work an eight hour day."   However, as the defendant observes, the ALJ was citing the

daily activities as inconsistent with the level of symptoms alleged by plaintiff, not as a measure

of physical capacity.

On appeal, plaintiff suggests that her depression may be the cause of her noncompliance

with medical directives or that her noncompliance may be the result of an inability pay.   These

arguments are to no avail for two reasons: (1) the ALJ found plaintiff's depression was not

severe, and (2) there is no evidence in the record that plaintiff's depression was the cause of her noncompliance.

Many of the medical directives by plaintiff's treating physicians and cited by the ALJ cost nothing, including diet and exercise.   However, the record contains numerous entries reflecting that plaintiff had disposable income that she diverted for other purposes and that she routinely ignored the advice of her doctors: in November 2007, plaintiff told Dr. Hayes that she had recently returned from a cruise [to the Bahamas] and indicated "she did not make any attempt to limit her diet while she was there" (Tr. 449); on March 13, 2008, plaintiff acknowledged "eating ice cream at least once a week" (Tr. 446); and on April 17, 2009, Dr. Hayes noted plaintiff had recently "returned from a cruise where she ate everything in sight and did not attempt to exercise" (Tr. 684).   On October 3, 2006, a treating physician "encourage [plaintiff] to walk, stretch and exercise daily" (Tr. 409).   As noted by the ALJ, Dr. Hayes has recommended exercise on many occasions.   On April 9, 2008, when discussing physical therapy after her back surgery, plaintiff "indicated she would rather not pursue that.   She would rather work on this independently" (Tr. 782). As observed by Dr. Hays on September 22, 2009, plaintiff "seems to want the medical profession to fix her without any effort on her part" (Tr. 636).

I find the ALJ did not err in reaching conclusions about plaintiff's credibility.

## VII.   *CONCLUSIONS*

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision finding plaintiff not disabled.   Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.   It is further

ORDERED that the decision of the Commissioner is affirmed.

**/s/ Robert E. Larsen**　　　
ROBERT E. LARSEN
United States Magistrate Judge

January 21, 2014
Kansas City, Missouri